**UNITED STATES of America,**
**Appellant,**

v.

**ZIONS SAVINGS AND LOAN ASSOCIA-**
**TION, a corporation, Appellee.**

**No. 7041.**

United States Court of Appeals
Tenth Circuit.

Jan. 2, 1963.

Donald P. Horwitz, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Meyer Rothwacks, Attorneys, Department of Justice, and William T. Thurman, U. S. Atty., were with him on the brief), for appellant.

Hardin A. Whitney, Jr., Salt Lake City, Utah (Dan T. Moyle of Moyle & Moyle, Salt Lake City, Utah, was with him on the brief), for appellee.

Before PICKETT, BREITENSTEIN and HILL, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The Commissioner of Internal Revenue disallowed certain bad debt deductions claimed by appellee-plaintiff, Zions Savings and Loan Association (taxpayer), in its federal income tax returns. On suit to recover the district court held for the taxpayer. The United States has appealed.

The Revenue Act of 1951 removed the theretofore existing exemption of building and loan associations from federal income tax.[1] Included in that Act was a section, now § 593 of the Internal Revenue Code of 1954,[2] which granted liberal bad debt deductions to domestic building and loan associations.[3] This liberality resulted from "a concern on the part of Congress that previously tax exempt institutions be afforded an opportunity to accumulate generous reserves against possible losses."[4] Section 593 provides

---

1. Act of October 20, 1951, ch. 521, P.L. 183, § 313, 65 Stat. 452, 490.

2. The language of § 593 was taken without material change from § 313(e) of the 1951 Act, supra.

3. "In the case of a mutual savings bank not having capital stock represented by shares, a domestic building and loan association, and a cooperative bank without capital stock organized and operated for mutual purposes and without profit, the reasonable addition to a reserve for bad debts under section 166(c) shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of—

"(1) the amount of its taxable income for the taxable year, computed without regard to this section, or

"(2) the amount by which 12 percent of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year." Int. Rev.Code of 1954, § 593, effective initially December 31, 1951, 65 Stat. 491.

4. Arcadia Savings & Loan Association v. Commissioner of Internal Revenue, 9 Cir., 300 F.2d 247, 251.

that in each year the addition to the reserve for bad debts shall not be greater than the lesser of—

"(1) the amount of its taxable income for the taxable year, computed without regard to this section, or

"(2) the amount by which 12 percent of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year."

Taxpayer is a stock company. In December, 1951, it declared a stock dividend, transferred $465,812.65 from its reserve for contingencies account to its permanent nonwithdrawable capital account, and issued one additional share of stock for each share of stock then outstanding.

For the years 1954, 1955, and 1956 taxpayer took as a bad debt deduction and as an addition to its reserve for bad debts amounts equalling in each year its net income for that year computed without regard to the deductions allowed by § 593. The amount so claimed was less than that resulting from the deduction of the sum of the surplus, undivided profits, and reserves from 12 percent of the total deposits because the amount of the surplus account had been reduced by the transfer therefrom to the capital account in accordance with the declaration of the stock dividend. The Commissioner held that the $465,000 transferred to the capital account had to be included in surplus. Such inclusion, by increasing the surplus, reduced the difference between surplus, undivided profits, and reserves, and 12 percent of the total deposits and thereby made applicable subparagraph (2) of § 593. The decision of the Com-

missioner increased the tax payable for the three years by $40,640.26.

The trial court held that the taxpayer was a domestic building and loan association within the definition of that term by 26 U.S.C. § 7701(a) (19) [5] and, on this appeal, the government does not contest the validity of that holding. The question is not whether taxpayer is covered by § 593 but how that section should be interpreted and applied.

Under the § 593 formula the existence of a low total of surplus, undivided profits, and reserves favors the taxpayer by increasing the difference between that figure and 12 percent of the total deposits.[6] Realization of this advantage may have influenced the taxpayer in the declaration of the stock dividend. A true mutual building and loan association, having no capital stock, could not take similar action.

Consideration of the meaning and application of the phrase "surplus, undivided profits, and reserves" brings us into the mysterious field of corporate accounting. The many judicial decisions which have explored this field are not particularly helpful because they deal with specific situations not comparable with that presented here. The principles and procedures of accountancy found in the writings of acknowledged leaders in the profession are not decisive because, depending on the selection of material, support can be found for the position of each party to this controversy.

The Supreme Court has said that "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses."[7] With full knowledge of the danger of over-simplification, we shall give to the pertinent phrases what we believe to be the common meaning.

---

5. This definition is taken from § 313(i) of the 1951 Act, supra.

6. The advantage exists until the difference becomes greater than the taxable income for the year computed without regard to § 593. When this occurs, subparagraph (1) controls.

7. Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301, quoted in Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 687, 82 S.Ct. 1080, 8 L.Ed.2d 187.

■ Surplus is the name of an account which "represents the net assets of a corporation in excess of all liabilities including its capital stock." [8] Undivided profits are profits "which have neither been distributed as dividends nor carried to surplus account upon the closing of the books; that is, current undistributed earnings." [9] A prerequisite to the existence of either undivided profits or surplus is an excess of net assets over capital stock.[10] Although the term "reserves" has many meanings, as used in the situation with which we are confronted it represents "an appropriation or a segregation of surplus."

■ The experts on accountancy distinguish between "paid-in" surplus and "earned" surplus. The first is surplus which has accumulated by the sale of stock at more than par. The second is surplus resulting from the profitable operations of the company. The experts also distinguish "paid-in" capital from capital acquired by the transfer of earned surplus. "Paid-in" capital is capital derived from the sale of stock.

■ The declaration of a stock dividend is a method of capitalizing, instead of distributing, accumulated profits.[11] The result is accomplished by a charge against the surplus account and a corresponding credit to the capital account together with the issuance of new stock to the stockholders in proportion to their previous holdings. When a stock dividend is declared, the stockholders receive nothing from the assets and the transferred sum "remains the property of the company, and subject to business risks which may result in wiping out the entire investment." [12]

An accountant of outstanding qualifications in his profession testified for the taxpayer and, as an expert, expressed the opinion that, after the transfer from surplus to capital pursuant to the stock dividend, the sum so transferred "would in the accounting sense no longer be part of surplus, undivided profits, and reserves, but part of permanent capital."

The government called no witness and relies heavily on § 1.593–1(d) (2) (i) and (iii), Treasury Regulations on Income Tax (1954 Code).[13] The regulation defines "surplus, undivided profits, and reserves" to mean "the amount by which the total assets of an institution exceed the amount of the total liabilities of such an institution." As to total liabilities, the regulation says:

"In the case of a building and loan association having permanent non-withdrawable capital stock represented by shares, the paid-in amount of such stock shall also be considered a liability."

The argument for the government is that the inclusion of "paid-in" capital as a liability is an exclusion from total liabilities of capital derived from other sources, specifically capital derived from the transfer of earned surplus by a stock dividend. Such exclusion would reduce total liabilities and increase the sum represented by surplus, undivided profits, and reserves.

Government counsel contend that the regulations carry out the intent of Congress to give no advantage to stock companies over mutual associations. Such intent is not derived from the statute but rather from the legislative history of § 593. More specifically, it is assumed from the legislative history which indicates that in passing the 1951 Act, of which the provisions of § 593 were a part, Congress was primarily concerned with

8. Edwards v. Douglas, 269 U.S. 204, 214, 46 S.Ct. 85, 88, 70 L.Ed. 235.

9. Ibid. pp. 214–215, 46 S.Ct. p. 89.

10. Willcuts v. Milton Dairy Company, 275 U.S. 215, 218, 48 S.Ct. 71, 72 L.Ed. 247.

11. Eisner v. Macomber, 252 U.S. 189, 210–211, 40 S.Ct. 189, 64 L.Ed. 521.

12. Ibid. at p. 211, 40 S.Ct. at p. 194.

13. In all material parts this section is the same as the regulation which it superseded. See 26 CFR (1953 Revision) § 39.23(k)–5(b) (2) (ii).

mutual type organizations.[14] The difficulty with the argument is that it overlooks the language of § 593.

**∎∎** When a statute is unambiguous, recourse may not be had to legislative history as an aid in ascertaining congressional intent.[15] The applicability of § 593 to building and loan associations having capital stock is clear and unambiguous. That section by express provision applies to "a mutual savings bank not having capital stock represented by shares, a domestic building and loan association, and a cooperative bank without capital stock organized and operated for mutual purposes and without profit." The absence of the capital stock restriction on a building and loan association is significant and can mean only that Congress intended § 593 to cover both stock companies and mutual associations.[16]

**∎** Nothing in the statute indicates that by the inclusion of stock companies in § 593 Congress intended to give any different meanings to surplus, undivided profits, and reserves than the commonly accepted meanings to which we have directed attention. If Congress had intended the result now sought by the government, it could have used such words as "surplus, undivided profits, reserves and capital, except paid-in capital" or some other relatively short phrase. It did not do so. Treasury Regulation § 1.593–1(d) (iii), insofar as it defines "surplus, undivided profits, and reserves" as including the amount of a stock dividend declared and made prior to December 31, 1951, is contrary to the terms of the statute and, to that extent, is the exercise of a non-delegable legislative function.[17]

Government counsel say that Congress tacitly approved the regulation by the re-enactment of the statute substantially unchanged in the 1954 Internal Revenue Code.[18] The point has no persuasive force because the 1954 statute was a recodification made shortly after the issuance of the regulation and nothing indicates that Congress gave any attention to the regulation.

**∎** Counsel for the taxpayer emphasize that the approval of the taxpayer's application for insurance by the Federal Savings and Loan Insurance Corporation, a federally chartered corporation insuring depositors' accounts in savings and loan associations required that:

> "in computing the ratio of general reserves and undivided profits to net assets, such reserves refer to 'free' reserves which are immediately available to the Board of Directors for the absorption of losses, and that the permanent stock is not included or considered for the purposes of these requirements as a reserve account."

This requirement differs from the Treasury Regulation as it excludes from reserves "permanent stock" while the regulation excludes only "paid-in" capital. Permanent stock may issue against amounts "paid in" and amounts transferred from surplus. Fairness to a taxpayer includes "some semblance of coordination between the several branches

---

14. See 2 U.S.Cong.Serv. '51, pp. 1994–1997.

15. Diamond A Cattle Company v. Commissioner of Internal Revenue, 10 Cir., 233 F.2d 739, 742; and Nicholas v. Denver &. R. G. W. R. Co., 10 Cir., 195 F.2d 428, 431. Cf. Gay v. Ruff, 292 U.S. 25, 31, 54 S.Ct. 608, 78 L.Ed. 1099.

16. The statutory language is carried into the Treasury Regulations. See §§ 39.23 (k)–5(b) (2) and 1.593–1(d), both supra.

17. A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446.

18. See Lykes v. United States, 343 U.S. 118, 127, 72 S.Ct. 585, 96 L.Ed. 791; Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52.

of the government in dealing with a taxpayer." [19]

The words of the statute must be interpreted and applied in their commonly accepted sense. Otherwise we are in a maze of confusion because of the uncertainty of definition when they are treated by specialists as words of art.[20] The statute does not define any of the pertinent terms. The statute does not specifically or generally equate surplus, undivided profits, and reserves with earnings and profits.

The issue is whether a sum derived from earnings, allocated to surplus, and transferred to capital before the effective date of the taxing statute by the declaration of a stock dividend loses its character as surplus.[21] We believe that it does because as surplus the fund was distributable to the stockholders in the form of cash dividends but, after transference to capital, it is not. If the company had declared a cash dividend and if the stockholders had each used the amount received to buy additional shares of stock, no question would arise, even under the Treasury Regulations, over the classification of the amounts so paid as capital.[22] Although a stock dividend is a bookkeeping adjustment of accounts, the statute does not forbid such an adjustment and the practice has long been known.

We hold that the transfer from surplus to capital, before the effective date of the Act of which § 593 was a part, pursuant to the stock dividend, removed the sum so transferred from "surplus, undivided profits, and reserves" as those terms are used separately and collectively in § 593(2).

Affirmed.

19. Citizens' Nat. Bank of Orange v. Commissioner of Internal Revenue, 4 Cir., 74 F.2d 604, 605, 100 A.L.R. 699.

20. In Old Colony Railroad Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 561, 52 S.Ct. 211, 214, 76 L.Ed. 484, it was said: "If there were doubt as to the connotation of the term, and another meaning might be adopted, the fact of its use in a tax statute would incline the scale to the construction most favorable to the taxpayer."

21. Neither party places reliance on the word "reserves" and the undivided profits of the taxpayer had gone into surplus.

22. We realize that cash dividends are taxable income to the recipients but that fact does not detract from the principle stated.