**UNITED STATES of America,
Libelant-Appellee,**

**v.**

**H. M. BRANSON DISTRIBUTING COMPANY and Lion Manufacturing Corporation, (Two Coin-Operated Pinball Machines Nos. B–1197 and B–1378), Claimants-Appellants.**

**No. 16623.**

United States Court of Appeals
Sixth Circuit.

Aug. 2, 1968.

Paul R. Connolly, Washington, D. C., E. Barrett Prettyman, Jr., John J. Ross, Washington, D. C., Ben T. Cooper, Louisville, Ky., Martin M. Nelson, Chicago, Ill., on brief, for appellants.

Philip Wilens, Department of Justice, Washington, D. C., Ernest W. Rivers, U. S. Atty., Louisville, Ky., Fred M. Vinson, Jr., Asst. Atty. Gen., Philip J. Hoskins, Lawrence Lippe, Attys., Department of Justice, Washington, D. C., on brief, for appellee.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and THORNTON, Senior District Judge.*

THORNTON, Senior District Judge.

This is an appeal from a judgment of forfeiture entered by the trial court in an action commenced by the filing of a Libel by the government under the provisions of 15 U.S.C. §§ 1171–1178—the Gambling Devices Act. Involved are two pinball machines manufactured by the Lion Manufacturing Corporation of Chicago, Illinois, and distributed by H. M. Branson Distributing Company, Louisville, Kentucky.

In the trial court it was stipulated that the two pinball machines were shipped in interstate commerce from Chicago, Illinois to Louisville, Kentucky. The shipment took place on February 14, 1964. The two machines were substantially identical and carried the trade name, "Bally Bounty." At the termination of the forfeiture proceedings the trial judge found the respondent machines to be gambling devices and subject to be condemned and to be forfeited to the United States, pursuant to the provisions of 15 U.S.C. § 1177.

The appellants present the following questions for review:

"I. Are the appellant machines, seized by the United States allegedly pursuant to the Gambling Devices Act of 1962 (15 U.S.C. §§ 1171–1178), exempt from seizure under that Act because enumerated as lawful in a Kentucky statute?

II. Is the Gambling Devices Act so vague and ambiguous as to violate the Due Process Clause of the Fifth Amendment to the United States Constitution?

III. Did the District Court, in violation of the Sixth and Seventh Amendments to the United States Constitution, effectively deny appellants a jury trial by refusing to instruct the jury

---

* Thomas P. Thornton, Senior District Judge of the Eastern District of Michigan, sitting by designation.

on the elements and meaning of the controlling statute and then, months later, making its own findings that had never been submitted to or found by the jury?

IV. Did the District Court commit reversible error by allowing the Government (a) to introduce evidence obtained by an unauthorized and illegal grant of 'immunity'; (b) to show that 'gaming' tax stamps were in some instances placed on machines similar to the appellant machines, and (c) to imply erroneously that the appellants' manufacturer had pleaded guilty to a prior indictment involving gambling devices?

V. Did the Government fail to prove a violation of the Gambling Devices Act?"

The questions for review will be considered in a sequence different from the above in order to give better coherence to our treatment of them. The trial judge, in his Findings of Fact and Conclusions of Law, has set forth a description of the pinball machines involved in this litigation and our analysis of the record establishes that his description conforms to the testimony and we adopt it. It is as follows:

"2. That the respondents are coin activated electrically operated machines. The machines when assembled and ready for use consist of a vertical section attached to a base section to which are secured four legs. The base section contains a plunger device, a number of holes drilled into an inclined playboard and a quantity of posts with rubber bumpers placed at intervals thereon. The devices are each equipped with eight metal balls, five of which are released for play upon insertion of a coin. The vertical section has a glass front upon which the results of play are recorded by electrically operated equipment. The object of play of the devices is to propel the balls by means of the plunger onto the inclined playboard so that the ball will fall into certain holes and thereby light corresponding light bulbs located on the vertical section of the machines. When three or more bulbs are lit in a row, or in some other predetermined order, the machine registers so-called 'free plays.' The machines are so constructed that any number of coins may be inserted therein before actual play of the game begins. The number of 'free plays' to be awarded for successful operation of the device can be increased by insertion of additional coins prior to play of the machine, although the rate of increase of free play awards cannot be controlled by the player and may or may not increase upon the insertion of a particular coin. The machine also provides other 'features,' the most prominent of which is denominated 'skill-shot' which will award a designated number of 'free plays' if the first ball played falls into any of several predesignated holes. After striking the ball with the plunger, the ball is propelled onto the playboard and descends the inclined plane totally dependent upon the law of gravity and chance contacts with the posts affixed to the board. The player has no control over this descent and only negligible, if any, skill is involved in the operation or play of the device. Free plays won on the machine are recorded on a three-digit counting meter (Replay register). The register is numbered so that it will apparently record 999 free games but a stop is contained in these devices so that, in fact, the register will record only 899 free games. Free games so recorded may be used by depressing appropriate buttons to activate the machine; to activate the mechanism which controls the increase of the free game awards, or to activate other features of the machine. Each such use decreases the number shown on the replay register by one. The replay register can be immediately cleared by operation of a non-off switch located on the base section of the device or by disconnecting the device from its pow-

er source and then reconnecting it. Inside the base section are located two additional meters referred to as the total plays meter and the replays meter. The total plays meter records the number of coins inserted in the device and the number of free plays used in the play of the machine. The replays meter records the total number of free plays which have been won on the play of the machine. Subtracting the total registered on the replays meter and the total of coins in the coin box from the total registered on the total plays meter will result in the number of free games eliminated from the machine without being used in play. The devices are so equipped that the replay meter may be readily rewired in order to record only the number of free games so eliminated."

## DOES THE ACT VIOLATE THE DUE PROCESS CLAUSE BECAUSE OF VAGUENESS AND AMBIGUITY?

The relevant portions of the Gambling Devices Act of 1962 as they apply to this litigation are as follows:

"§ 1171.

As used in this chapter—

(a) The term 'gambling device' means—

(1) any so-called 'slot machine' or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

(2) any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of

the application of an element of chance, any money or property, or

(B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

(3) any subassembly or essential part intended to be used in connection with any such machine or mechanical device, but which is not attached to any such machine or mechanical device as a constituent part.

\* \* \* \* \* \*

(d) The term 'interstate or foreign commerce' means commerce (1) between any State or possession of the United States and any place outside of such State or possession, or (2) between points in the same State or possession of the United States but through any place outside thereof."

"§ 1172.

It shall be unlawful knowingly to transport any gambling device to any place in a State, the District of Columbia, or a possession of the United States from any place outside of such State, the District of Columbia, or possession: *Provided*, That this section shall not apply to transportation of any gambling device to a place in any State which has enacted a law providing for the exemption of such State from the provisions of this section, or to a place in any subdivision of a State if the State in which such subdivision is located has enacted a law providing for the exemption of such subdivision from the provisions of this section, nor shall this section apply to any gambling device used or designed for use at and transported to licensed gambling establishments where betting is legal under applicable State laws: *Provided further,* That it shall not be unlawful to transport in interstate or foreign commerce any gambling device into any State in which the transported gambling device

is specifically enumerated as lawful in a statute of that State."

"§ 1177.

Any gambling device transported, delivered, shipped, manufactured, reconditioned, repaired, sold, disposed of, received, possessed, or used in violation of the provisions of this chapter shall be seized and forfeited to the United States. * * *"

■ The appellants in complaining that the Gambling Devices Act is so vague and ambiguous as to violate the Due Process Clause of the Fifth Amendment represent in their brief that the Information filed in this cause though technically a civil pleading is in substance and effect a criminal one; that a forfeiture proceeding is quasi-criminal in character; that a statute may not be construed in one fashion for civil cases and in another for criminal cases. The brief continues with the statement that it is well settled that a criminal statute which is vague, indefinite and uncertain is unconstitutional and void as offensive to due process of law. These contentions are irrelevant to the subject matter herein. The authority to forfeit and condemn property for violation of the Gambling Devices Act of 1962 is found at 15 U.S.C. § 1177, supra. Forfeitures on land may take on attributes of criminal proceedings insofar as certain Fourth Amendment procedures are concerned. One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U. S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170, involved the stopping and searching of an automobile "which was low in the rear, quite low," and the finding of thirty-one cases of liquor therein by state officers. The State filed a petition for forfeiture of this car which was dismissed by the trial court but upheld by the Pennsylvania appeal courts. The United States Supreme Court reversed, holding in effect that evidence which is obtained in violation of the Fourth Amendment may not be relied upon to sustain a forfeiture. The question that was so determined in that case is not present here.

"Nevertheless, proceedings for forfeitures on land commenced by a libel in rem, are in all respects civil actions and governed by the Federal Rules of Civil Procedure after the libel is filed and jurisdiction obtained." Barron and Holtzoff, Practice and Procedure, Section 128. Rule 81(a) (2) as amended.

Appellants further complain that nowhere in the Act is "gambling" defined; that since a pinball machine may be forfeited if it was "designed and manufactured primarily for gambling purposes" the word "primarily" likewise is not defined by the Act; that the statute does not inform industry how the word "intended" is to be determined; and appellants conclude this section of their brief with the statement that: "These are only a few of the many ambiguities inherent in this complex *criminal statute*." [Emphasis supplied]

The Libel of Information filed in this action relies upon 28 U.S.C. § 1345 for the Court's jurisdiction. It alleges violations of Sections 1171 and 1172 of Title 15 U.S.C. and relies on Section 1177 for relief. None of these is a criminal statute. The appellants continue their complaint with the observation that "even assuming that legislative history could waive an otherwise unconstitutionally vague criminal statute * * *" —and then proceed to extensively review the discussions and suggestions during the Congressional hearings on the proposed legislation which spawned these statutes. It strikes us that there is no one more knowledgeable as to the meaning of the word "gambling" than the manufacturer of pinball machines. William F. O'Donnell, President of Bally and Lion Manufacturing Corporations and a person who had been associated with the pinball machine manufacturing business since 1946 testified under examination by his counsel in part as follows:

"Q. Now, has Lion made any other shipments of the Bally Bounty to states other than Kentucky, Louisiana,

Tennessee, Maryland and Mississippi?

A. The State of Nevada is the only one in addition to that.

Q. Did you write a letter to the Department advising of the shipment of the machines into Nevada like you did the other states?

A. No, sir.

Q. And why not?

A. Well, because Nevada passed a statute which exempted the State of Nevada from any provisions of this act.

Q. You had no doubt about Nevada then, is that correct?

A. That's correct."

It is apparent from the foregoing testimony that the provisions of the Act which are so disturbing to appellants' brief writer because of "vagueness" and "ambiguity" are known to and are readily understandable by appellants' president. The language of Sections 1171, 1172 and 1177 of 15 U.S.C. is clear and readily understandable. To contend that it is otherwise is an insult to the intelligence of even a beginner reader. Since these statutes are not in the least ambiguous, resort to their legislative history should not be had for the purpose of verifying that that which is unambiguous is unambiguous. United States v. Redmond, 328 F.2d 707, 711 (C.A.6 1964); Hilliard v. United States, 310 F.2d 631, 632 (C.A.6 1962); Essex County & Vic. Dist. Coun. of Carpenters, etc. v. N.L.R. B., 332 F.2d 636, 641 (C.A.3 1964); United States v. Zions Savings and Loan Association, 313 F.2d 331, 336 (C.A.10 1963).

WAS THERE EFFECTIVE DENIAL OF JURY TRIAL ON ACCOUNT OF PROCEDURES EMPLOYED BY DISTRICT COURT?

The appellants allege that the trial court, in violation of the Sixth and Seventh Amendments to the United States Constitution, effectively denied appellants a jury trial by refusing to instruct the jury on the elements and meaning of the controlling statute and subsequently (a matter of months later) making its own findings that had never been found by the jury on questions that were not submitted to it.

At the conclusion of the evidence, the arguments and the instructions the trial judge submitted to the jury the following interrogatory which received the indicated "yes" response:

"Were the Two Coin-Operated Pinball Machines, Nos. B–1197 and B–1378, Respondents, designed and manufactured primarily for use in connection with gambling and by the operation of which a person may become entitled to receive as the result of the application of an element of chance any money or property?

Answer 'Yes' or 'No' Answer: Yes"

The trial judge then provided counsel for the respective parties with the opportunity to file briefs on the question of the exception under the Kentucky Revised Statutes, Section 436.230(5).

Prior to the foregoing interrogatory response by the jury the claimants had filed the following answer to the Amended Libel of Information:

"FIRST DEFENSE.

The Amended Libel of Information fails to state a claim against the respondents upon which relief can be granted.

SECOND DEFENSE.

Answering specifically the numbered paragraphs of the Amended Libel, Claimants say:

(1) Claimants are not required to answer the allegation contained in Paragraph 1 of the Amended Libel.

(2) Claimants are without knowledge of the present location of the respondents. Claimants admit that respondents were seized by Federal Agents and assume continuing Federal custody, but deny that respondents to this Amended Libel are gambling devices.

(3) Claimants deny that respondents are 'gambling devices' within the meaning of 15 U.S.C. § 1171(a) (2) (B), and specifically deny that said respondents are designed and manufactured primarily for use in connection with gambling, but aver that respondents give only the right of replay.

(4) Claimants admit that the respondents were transported in interest [sic] commerce from Chicago, Illinois to Louisville, Kentucky, but deny that such transportation was in violation of 15 U.S.C. § 1171 or any other law of the United States.

(5) Since respondents were not transported in interstate commerce in violation of 15 U.S.C. § 1172, they are not subject to seizure and forfeiture by the United States.

### THIRD DEFENSE.

Claimants assert that, should it be determined that the respondents are 'gambling devices' [within] the meaning of 15 U.S.C. § 1171(a) (2) (B), then and in that event, they are exempted from seizure and forfeiture on account of their shipment from Chicago, Illinois to Louisville, Kentucky by reason of the fact that they are specified to be lawful under § 436.230(5), Kentucky Revised Statutes, and that on that account, exempted from Federal seizure by reason of the provisions of 15 U.S.C. § 1172.

### FOURTH DEFENSE.

Claimants assert that the respondents are not subject to forfeiture and seizure by reason of the fact that they are exempt pinball machines within the meaning of 15 U.S.C. § 1178(2).

### FIFTH DEFENSE.

Claimants assert that the Act of Congress involved herein and the application thereof to the respondents and Claimants is void and unconstitutional and violative of due process of law, in that it is vague, uncertain and indefinite and does not furnish an adequate and clear statutory standard for determining whether respondent machines are prohibited in interstate commerce or whether they are exempted from any such prohibitions.

Wherefore, Claimants pray:

(1) That the Amended Libel be dismissed.

(2) That any attachments of respondent machines be dissolved.

(3) That said respondent machines be returned to Claimants.

(4) That the Court grant to Claimants such other and additional relief to which they may be entitled, including a jury trial."

An analysis of the foregoing Answer to the Libel, and particularly the "Second Defense," reveals that certain factual admissions were made therein by the claimants, leaving for factual determination the questions that were submitted to the jury by the trial judge in the interrogatory. The First, Third, Fourth and Fifth Defenses in the claimants' Answer contain legal defenses for the Court's consideration.

The instructions to the jury that were timely requested by claimants are as follows:

"(1) You are instructed that the burden of proof is on the United States to prove clearly and certainly by the evidence that the Bally Bounty Machine introduced in this case was designed and manufactured primarily for use in connection with gambling, as these terms are hereinafter defined for you, and 'by the operation of which a person may become entitled to receive, as a result of the application of an element of chance, any money or property,' as this condition is hereinafter explained to you.

By designed is meant the purpose and intent of the manufacturer. By manufactured is meant made, fabricated or produced.

Primarily means that this is the first, preeminent, overriding, principal, unique and chief purpose.

For use in connection with gambling here means that gambling is its chief, principal or preeminent purpose and the mere ability or capacity to serve incidentally or collaterally in a gambling enterprise is not sufficient.

Gambling is here defined as the art of wagering money upon the pure chance that a reward of greater value than the investment may result.

(2) You are instructed that in addition to finding that the Bally Bounty machine was primarily designed and manufactured for use in connection with gambling, as those terms heretofore have been defined, you must find that the machine in and of itself entitles a successful player to receive money or property. It is insufficient that the owner or operator of the machine should elect to redeem free plays with money or property.

(3) You are instructed that in considering whether the Bally Bounty machine is a gambling device within the meaning of the Gambling Devices Act of 1962 you shall not consider whether or not a special federal tax stamp for a gambling device under the Internal Revenue Code of 1954 has usually been affixed to this type of machine in the Western District of Kentucky.

(4) You are instructed that you may not find that the Bally Bounty machine is a gambling device within the meaning of the Gambling Devices Act of 1962 solely on the evidence that machines of similar character are used for gambling payoffs in the Western District of Kentucky.

(5) You are instructed that you may not find that the Bally Bounty machine is a gambling device within the meaning of the Gambling Devices Act of 1962 upon the evidence of its physical characteristics or upon the basis of comparison with other types of pinball machines.

(6) You are instructed that section 8 [9] of the Gambling Devices Act of 1962 provides in pertinent part as follows:

'None of the provisions of the Act shall be construed to apply—

"(1) to any machine or mechanical device designed and manufactured primarily for use at a racetrack in connection with parimutuel betting.

"(2) to any machine or mechanical device, such as a coin-operated bowling alley, shuffle board, marble machine (a so-called pinball machine), or mechanical gun, which is not designed and manufactured primarily for use in connection with gambling, and (a) which when operated does not deliver as a result of the application of an element of chance, any money or property, or (b) by the operation of which a person may not become entitled to receive, as the result of the application of an element of chance, any money or property, or

"(3) to any so-called claw, crane, or digger machine which is not operated by coin, is actuated by a crank, and is designed and manufactured primarily for use at carnivals or county or State fairs.' "

Accordingly, if you find that the Bally Bounty machine is a 'so-called pinball machine' within the meaning of this section you shall return a verdict in favor of the respondent machines."

It is readily apparent that the substance of the above-requested instructions constitutes a "slanted" jury charge calculated to produce only one possible verdict—in favor of the respondent machines. If given by the Court the jury would have been misled and confused.

Robert A. Miller, an FBI agent assigned to the Federal Bureau of Investigation laboratory in Washington, D. C., appeared as a government witness and testified that his duties included the examination of mechanical and electrical

devices of various types associated with cases which had been investigated by his agency. He examined the libeled machines and from his background in Mechanical Engineering and his six and one half years' laboratory experience he gave detailed testimony, both descriptive and demonstrative, to the Court and jury as to how these machines worked.[1] His testimony was elicited by extensive direct and cross examination. The jury also listened to an abundance of testimony from dealers and operators in the use of pinball machines of all makes and descriptions.

From the nature of the evidence that was presented and the easily understood provisions of the statute under which the Libel was filed, the purely factual issue for determination by the jury was a simple one and the District Judge did not abuse his discretion in invoking the Special Interrogatories provisions of Rule 49(a), Federal Rules of Civil Procedure. In so doing the Court's explanation and instructions to the jury were adequate in the light of all the circumstances.

■ On appeal the appellants complain that:

"*[T]he jury was never instructed about the significance of any wires, about the intent of the manufacturer, or about the relevance of knocked-off games, and no finding was requested of the jurors or made by them on these facts."

Rule 49(a) provides as follows:

"Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such oth-

er method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

The Record on Appeal establishes that the appellants submitted Requests to Charge. However, there is no record of any demand upon the Court by the appellants, before the jury retired, for submission to the jury of any factual issue or issues that they felt was being omitted by the Court. Neither is there any indication in the record that the claimants offered the Court any interrogatories of their own drafting to be additionally presented to the jury. Not having conformed to the requirements of the Rule in relation to alleged omitted factual issues raised by the pleadings or by the evidence, the appellants waived their right to a trial by jury on these issues.

During the discussion between the Court and counsel for the parties prior to submitting the Special Interrogatory to the jury the following colloquy took place:

"Mr. Connolly: What's—the burden is on us to exculpate ourselves from seizure. But the Government has an absolute burden to prove that this is in fact contraband.

By the Court: Well, from the reading there, as I understand it, the Court

---

1. Five pinball machines, including the two libeled machines, were set up and demonstrated in the courtroom during the progress of the trial. One of the libeled machines was set up and demonstrated in the courtroom during the argument on appeal.

decides whether or not there is probable cause, and, of course, under this proof there was probable cause.

Now, is it your contention that the burden now rests with you as the claimant?

Mr. Connolly: Only if Your Honor finds as a matter of law that these are gambling devices.

By the Court: And if I let the jury make that determination, what—

Mr. Connolly: (Interrupting) I don't think Your Honor can.

By the Court: Do you mean you have asked for this jury and you just want them to sit out here and perform no function whatsoever?

Mr. Connolly: Oh, I think they have a function, but I think after that—

By the Court: (Interrupting) Well, what function would they have to perform?

Mr. Connolly: Well, I think they are performing a function right now, as a matter of fact. I asked for a jury in order to force upon—I didn't mean this unpleasurably, or anything, but I asked for a jury to force the very decision that I'm calling upon Your Honor to make. And I'm not doing it just because you are Judge Brooks. I'd do it with respect to any judge, of course."

■ It is not within the contemplation of the Seventh Amendment, the statutes of the United States or Rule 38 F.R.Civ.P. That a jury trial should be used as a device to force a Court to make a decision that a party wants the Court to make. This use of the jury dilutes the claim of the appellants that they were denied their constitutional right to a jury trial to the point that it is without substance. The further complaint of the appellants that four months after the return of the answer to the Special Interrogatory the trial judge made findings that had not been submitted to or found by the jury is without merit. Rule 49 (a) provides that the Court may make findings on issues omitted from the special interrogatories. Further, upon the return of the answer to the Special Interrogatory the Court had left for determination the legal defenses set forth in the claimants' Amended Answer to the Amended Libel. In making this determination it was proper for the Court to support his Conclusions of Law with Findings of Fact.

## WAS THERE REVERSIBLE ERROR IN THREE EVIDENCE AREAS?

The appellants further assert that the trial court committed "reversible error by allowing the government (a) to introduce evidence obtained by an unauthorized and illegal grant of 'immunity,' (b) to show that 'gaming tax stamps were in some instances placed on appellant-like machines, and (c) to imply erroneously that the appellants' manufacturer had pleaded guilty to a prior indictment involving gambling devices."

The "immunity" question can be best illuminated by the substance of the testimony of Mr. Leon Shaikun who was called as a witness by the respondents. He testified that he is a lawyer, a member of the Bar of the State of Kentucky practicing in Louisville, an attorney for four of the pinball machine operators who had been subpoenaed as government witnesses for the trial of this cause; that he was present as attorney for his four clients at the taking of a series of depositions in the office of the United States Attorney in Louisville a few days prior to the commencement of the trial. He testified that at the same hearing Mr. Haddad, as associate counsel for the four operators, was also present and that the following took place:

"Q. [By Mr. Connolly] Now, did Mr. Haddad make the following statement to Mr. Scent:

'As I stated earlier, I think that as far as Mr. Berman is concerned and the other witnesses that have been called here to testify, that their testimony may be regarded in some respects as that it might at a later time be used again [sic] them in some type of a proceeding, either

criminal or civil and before agreeing to let them testify in this case, we have requested that the United States Attorney on behalf of the United States and the Commonwealth Attorney of this District on behalf of the Commonwealth of Kentucky, grant and extend to these witnesses immunity from prosecution on any of the testimony that should be given here today insofar as gambling matters or any related matters.

'Isn't that substantially what we have stated, that we would like to request of both Mr. Scent of the United States and Mr. Schroering of the Commonwealth?

'Mr. Scent: That is correct and of course, I would assume naturally that once testimony is given with the immunity attached, that immunity would continue in the event any of these people do testify.

'Mr. Haddad: Called to testify in the trial.

'Mr. Scent: Because they all have been subpoenaed for the trial and some will testify.

'Mr. Haddad: And immunity would extend for the deposition as well as the trial.

'Mr. Schroering: As far as the Commonwealth is concerned and within the jurisdiction I have, I so agree to extend immunity on matters criminally and peculiarly civilly which the Commonwealth may be interested in, as far as these witnesses are concerned.

'Mr. Haddad: Is that agreeable to you, Mr. Scent?

'Mr. Scent: That is agreeable with me.'

Did that take place?

A. Yes, sir."

Mr. Shaikun testified:

that he did not know that Mr. Scent, the United States Attorney, did not have authority to extend immunity to the witnesses,

that he had not looked up the matter but had advised his clients that Mr. Connolly (counsel for the claimants) had advised him that the United States Attorney did not have authority to grant them immunity;

that the judge said that there was some question that the immunity granted by Mr. Scent was valid;

that he (Shaikun) further told his clients that there was also some question about the immunity granted by the Commonwealth attorney;

that he said he would tell his clients that he had a gentleman's agreement with the Commonwealth attorney and the United States Attorney that they would not be prosecuted;

that, however, he did tell them that they had this immunity granted and that there was some question about whether or not the Commonwealth attorney and the government attorney had the authority to grant the immunity but that he thought they would stick by their word if their position were legally enforceable.

After having included, as part of the trial record, the background of what appears to be a grant of immunity of uncertain validity, the appellants contend in support of their request for reversal "that the Government as a matter of public policy cannot be allowed to win a case in the federal courts by deliberate, knowing and intentional trick or artifice, which is precisely what occurred here." This accusation is made in the face of the fact that the question of immunity was originally raised by co-counsel for the four witnesses. When the question of granting immunity was presented to and discussed with the trial judge by the attorney for the litigants, with the attorney for the witnesses also present, the Court concluded:

that no statutory right existed in Kentucky which gave the Commonwealth Attorney the power to grant immunity;

that there was no federal statute that gave the United States Attorney authority to grant them immunity;

that what they received was more or less the word of gentlemen that they would not instigate any prosecution based upon such testimony as was elicited on the taking of depositions;[2] that all of the foregoing should be clearly explained to the witnesses; and that the witnesses then be allowed to determine, with that explanation, whether they wished to testify or to invoke the Fifth Amendment privilege.

Because of this ruling by the Court the attorneys for the witnesses asked for and were given time to advise their clients. These attorneys then informed the Court that their clients had been advised that in all probability neither the United States Attorney nor the Commonwealth Attorney could grant immunity; that they were asked whether or not they desired to go on and testify, assuming absolutely that they had no immunity given to them by the United States Attorney or the Commonwealth Attorney; that each and every one of them said that they would go ahead and testify as they had theretofore, relying on the word given them by the United States Attorney and the Commonwealth Attorney that, so far as they could protect them, they would not prosecute them for any offense brought out by their testimony. Then the Court stated that "they fully understand there is no legal grant of immunity nor could there be under the circumstances," and Mr. Haddad, one of counsel for the witnesses, replied, "That's right, they understand that, yes." The Court then ordered that the witnesses be produced and stated that there was no need to caution them in any manner.

■ Rather than being held guilty of committing reversible error the trial judge is to be commended for the care and patience he exercised in making certain that time and legal advice were afforded the subpoenaed witnesses so that each could intelligently (with the advice of counsel) determine how he wanted to exercise his personal privilege. The government cannot here be held guilty of intentional trickery or artifice.

■ Reversible error is further claimed in that the trial court permitted testimony that location owners placed "gaming" tax stamps on Bally machines. The substance of appellants' claim is that as a matter of law the revenue statutes and the regulations thereunder are not pertinent to a proper interpretation of the Gambling Devices Act. On this proposition the trial judge's position was as follows:

"As I view it, whether or not this pinball machine is a gambling device prohibited by the statute, the burden is on the Government to show that it was designed and manufactured primarily for use in connection with gambling, and in order to do that, they must establish that it is put to the use, from which then the jury may draw a reasonable inference that it was designed and manufactured for that purpose and further from which they might draw a reasonable inference that the manufacturer designed it for that particular purpose."

This ruling is legally sound, and the evidence that the operators and location owners secured Federal Coin-Operated Gaming Device tax stamps costing $250 prior to placing on location in and about Louisville machines similar to claimants' devices was relevant and admissible as an element of usage.

■ Mr. O'Donnell, president of the corporation that manufactured the pinball machines here in dispute, was asked on cross examination by the United States Attorney if he was familiar with 18 U.S.C. § 1952. When O'Donnell stated that he was not he was asked, "Has Bally ever pleaded guilty to a violation

---

2. These were discovery depositions of potential witnesses who resided in the vicinity of Louisville, Kentucky.

of that statute as it involves pinball machines?" Counsel for claimants objected and moved for a mistrial. The trial judge overruled the objection and denied the motion for mistrial. In this the appellants charge reversible error. Counsel were called to the bench, and in the discussion Mr. Connolly advised the Court that "[a]fter the passage of the Gambling Devices Act of 1962, Bally and Lion controlling stock were owned by a bank, the American National Bank of Chicago, as trustees for the Estate of Raymond Maloney. An indictment was brought in Washington, and while our case was pending in the District of Columbia, Lion Mfg. Corp. v. Kennedy, 117 U.S.App.D.C. 367, 330 F.2d 833, the bank sold all of the assets and patents to a new group of investors, the five people named by Mr. O'Donnell. A new corporation was formed called Lion Manufacturing Company. The Department of Justice was informed about this. In the action in the United States Court of Appeals for the District of Columbia Circuit a motion was made to substitute the new corporation for the old. Lawyers representing the bank who still had the old corporation, because they had no interest in the case went out in Washington and entered a plea to this indictment." [3] If the appellants considered that the foregoing unanswered question was prejudicial the explanation should have been offered when O'Donnell was taken on re-direct examination. However, any explanation of the plea to the indictment would, in the opinion of this Court, be highly prejudicial to the claimants. This further emphasizes that the government's contested question was a proper one. The trial court did not abuse its discretion in denying the claimants' motion for mistrial. "[T]he granting of a motion for a mistrial upon the grounds complained of is ordinarily within the discretion of the trial court and a case will not be reversed except upon clear abuse of that discretion." Webb v. United States, 191 F.2d 512–516 (C.A.10 1951).

## RE FAILURE OF PROOF

Appellants contend that the government's entire case consisted of evidence pertaining to certain physical characteristics of appellant machines and of evidence that some location owners in two counties in Kentucky had made payoffs to players on Bally machines—this evidence, they contend, does not make a case under the Gambling Devices Act. They contend that the only direct evidence dealing with the subjective intent of the designer and manufacturer was the testimony of the president of Lion and Bally, who specifically stated that these machines were not designed or manufactured for use in connection with gambling. A short answer to this contention is that the jury's answer to the Special Interrogatory and the trial judge's Findings of Fact and Conclusions of Law constitute an objective finding(s) of intent which is free from biased interest, such finding(s) having been arrived at on the basis of all the evidence presented.

Appellants contend that the government knew into which states Lion was shipping its machines because Lion was voluntarily submitting this information to the Justice Department and that the government therefore had a choice of states and counties in which to make its seizure. They say that it chose to seize the two appellant machines in Louisville because it knew that location owners in and around Louisville had been paying off on Bally machines. They say further that even these location owners had to admit, however, that they did not pay off on the machines as shipped to them, because the machines had to be rewired before gambling became feasible. An explanation of this is found in the evidence. Exhibit 1 is a letter dated February 4, 1964 on the letterhead of Lion Manufacturing Corporation, Chicago, Illinois, addressed to Honorable Herbert

---

3. While the explanation does not disclose the type of plea, we are assuming it was a plea of guilty.

J. Miller, Assistant Attorney General, Criminal Division, United States Department of Justice, Washington, 25 D. C., and is as follows:

"Re: Gambling Devices Act of 1962.

Dear Mr. Miller:

Lion Manufacturing Corporation has sought the opinion of your division on the legality of shipping certain in-line, bingo type, multiple coin, multiple free play pinball machines into certain states pursuant to the 'so-called White exemption' in Section 2 of the Gambling Devices Act of 1962. This opinion has been refused.

This company believes that shipments of machines of the type just mentioned are legal and permissible in some states and uncertain in others. It believes upon advice of counsel that Kentucky is a legal and exempt state.

This letter, therefore, will serve to inform you and your associates that on Friday, February 14, 1964, this company intends to ship via Universal Carloading samples of the pinball machine of the type referred to above to H. M. Branson Distributing Company, 814 East Broadway, Louisville, Kentucky.

If these samples are acceptable to the Kentucky buyers, this company intends to take orders and ship such pinball machines in quantity as soon as they are available.

At your request, or upon the request of representatives of the Department or of the F.B.I., this company will be pleased to furnish you with shipping information pertaining to these additional machines.

This letter is not written because the company believes these shipments to be unlawful acts, but because we wish you to be fully informed concerning our operations so that if you disagree you may take such action as you deem appropriate with as little difficulty as possible. In this manner we hope that an appropriate and fair resolution may be found in a test case involving this difficult statute.

On the other hand, should you or your representatives advise us that such a shipment or shipments into Kentucky will be considered by the Department to be an unlawful act which you intend to prosecute, the company will refrain from making such a shipment or shipments. In order to assist you in any decision, we call to your attention that a pinball machine of the same type referred to above was shipped by our company to the F.B.I. Laboratory, c/o the Justice Department, under date of September 27, 1963. This same machine was returned to us by the F.B.I. Laboratory and received here at the factory on December 17, 1963.

Very truly yours,

Lion Manufacturing Corporation.

William T. O'Donnell, President."

This letter places the claimant Lion in rather an incongruous position. Lion invited the government to take such action as it deemed appropriate with as little difficulty as possible and then complained because the government chose to bring the action in Kentucky.

Since Lion Manufacturing Corporation, at least by February 4, 1964, had an arrangement with Branson Distributing Company of Louisville, Kentucky to ship samples of pinball machines to Branson on February 14, 1964 and since the answer of the claimants to the Libel of Information reveals the fact that Lion and Branson had a joint interest in the respondent pinball machines, the inference is inescapable that Lion knew or should have known, through Branson, that location owners in and around Louisville were paying off on Bally machines.

Wayne Neyens was produced as a witness for the government and testified that he was a pinball game designer and that he designs the games, lays out the play board, lays out the features, decides how the game should be built and then builds a model of the machine. He tes-

tified that he has been continually engaged in this type of work since 1936, and that during the last thirteen years as a designer for his company he had contact with persons at all levels of the industry, from the distributors down through the operators who came into their factory, who call up, who send in suggestions and ideas—he talks with all of them.

We adverted previously to appellants' statement that the machines as shipped to them were not used for payoffs but that they had to be rewired for that purpose. On this subject there was testimony from witnesses produced by the government, including an F.B.I. agent who examined machines similar to respondent machines and the pinball machine designer, Neyens, mentioned above. There was also testimony on this subject from pinball machine owners, operators, lessors and location owners representative of the pinball machine fraternity in and about Louisville. The substance of the testimony on the "rewiring" of the type of pinball machine here involved to convert it to a gambling device in full bloom was to the effect that the conversion required only a simple wiring adjustment which could be accomplished in a short time—from a few minutes to about twenty minutes. There was further evidence supportive of the fact that machines similar to the respondent machines were used as gambling devices in and about Louisville. There was testimony from operators that pinball machines similar to the respondent machines could not operate with financial success in the area of Louisville if the location owners did not pay out money on the machines and that such payoffs resulted from games of chance.

It is reasonable to conclude that a manufacturer of pinball machines does not fail to take advantage of a ready market for his product, particularly where, as here, he has a distributor in the market area (Branson). To supply the pinball market in Kentucky, Lion Manufacturing Corporation shipped Bal-

ly machines to serve a dual purpose: (1) to supply a device readily adaptable for gambling and (2) to attempt to exonerate itself from the provisions of the Gambling Devices Act concerning the design and manufacture of a pinball machine primarily for use in connection with gambling—a machine "by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property * * *." 15 U.S. C. § 1171(a) (2) (B).

■■ Since the intent with which an act is done is rarely if ever susceptible of proof by direct evidence, it must be ascertained from outward manifestations—from words or acts of a party in accomplishing the act and from the facts and circumstances attendant upon the act. In this case there is substantial evidence that supports both the factual conclusion arrived at by the jury in its answer to the Special Interrogatory and the Findings of Fact made by the trial judge. Therefore, appellants' claim that the government failed to prove a violation of the Gambling Devices Act is not sustained by the evidence and is without merit.

## ARE APPELLANT MACHINES EXEMPT FROM SEIZURE BECAUSE ENUMERATED AS LAWFUL IN A KENTUCKY STATUTE?

■ The provision in the Gambling Devices Act relied upon by the appellants as exempting appellant machines from the prohibition is 15 U.S.C. § 1172, which reads as follows:

*"Provided further,* That it shall not be unlawful to transport in interstate or foreign commerce any gambling device into any State in which the transported gambling device is specifically enumerated as lawful in a statute of that State."

It is the position of appellants that the Kentucky statute KRS § 436.230(5) contains language exempting from the prohibition of the state statute pinball ma-

chines having certain characteristics and that appellant machines fall within such category—that they are therefore lawful under Kentucky law and thus exempt under the federal Act. Shortly after the argument before this Court on the appeal herein, word was received that this question was pending before the Court of Appeals of Kentucky. Accordingly, the disposition of this appeal has been held up pending that decision. We now have before us a copy of the opinion rendered June 21, 1968 by the Court of Appeals of Kentucky in the case of A. B. Long Music Company et al. v. Commonwealth of Kentucky, and R. Brindley et al. v. Commonwealth of Kentucky, 429 S.W.2d 391.

At paragraph 2 of the Opinion of the Court of Appeals of Kentucky in Long Music Company, the Court states:

"The testimony shows that the machines possess the same basic characteristics and are similar to the machines forfeited in United States v. Two Coin-Operated Pinball Machines, W.D.Ky., 241 F.Supp. 57 (1965), decided about a month before these machines were seized."

The forfeiture case above-mentioned, decided by the United States District Court for the Western District of Kentucky is the instant case with which we are here dealing on appeal. Therefore the determination by the Kentucky Court of Appeals in Long Music Company concerns machines having the same basic characteristics as the two Bally pinball machines subject to the forefeiture proceeding involved herein. The Court there concluded that

"KRS 436.230 specifically forbids the 'setting up, keeping, managing, operating or conducting a keno bank, faro bank or other machine or contrivance used in betting' and fixes severe punishment for violation of the statute. KRS 436.230(3) provides: 'The change of the name of any of the games, banks, tables, machines or contrivances * * * shall not prevent' a conviction. The conclusion is ines-

capable that the Legislature intended to condemn all forms of lottery, however named, in obedience to the constitutional mandate. No contention is made, *nor doubtless could meritoriously have been made,* that the machine in question falls in the category of a game of skill. See KRS 436.230(5)." [Emphasis supplied.] A. B. Long Music Co. et al. v. Commonwealth of Kentucky, Court of Appeals of Kentucky, June 21, 1968, 429 S.W.2d 391.

A final word taken from appellants' own brief herein, at page 12, is that

"Even more to the point, the interpretation by the Kentucky Court of Appeals of its own state statute is absolutely binding on this Court. [Citations omitted.]"

Affirmed.