**LION MANUFACTURING CORPORA-TION (new Lion), et al., Appellants,**

v.

**Robert F. KENNEDY, Attorney General of the United States, Appellee.**

**No. 17832.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 18, 1963.

Decided March 5, 1964.

834

Mr. Paul R. Connolly, Washington, D. C., with whom Mr. John J. Ross, Washington, D. C., was on the brief, for appellants.

Mr. Sherman L. Cohn, Attorney, Department of Justice, with whom Asst. Atty. Gen. John W. Douglas, David C. Acheson, U. S. Atty., and David J. McCarthy, Jr., Attorney, Department of Justice, were on the brief, for appellee. Mr. Morton Hollander, Attorney, Department of Justice, also entered an appearance for appellee.

Before EDGERTON, Senior Circuit Judge, and DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

The appellants, two corporations and two individual officers thereof, brought suit in the District Court against the Attorney General of the United States to enjoin the enforcement of the Slot Machine Act of 1951, 64 Stat. 1134, as amended by the Gambling Devices Act of 1962, 76 Stat. 1075, 15 U.S.C.A. §§ 1171–1178. The complaint also sought a declaratory judgment to the effect that the statute is unconstitutional, the manufacturing operations of appellants are not within its scope, and it is not unlawful for appellants to transport any machine in interstate commerce into any state where such machine is legal. Because the request for injunctive relief was founded upon the asserted unconstitutionality of the statute, appellants asked for the convening of a three-judge court which, under the terms of 28 U.S.C. § 2282, is the only tribunal authorized to afford relief of this nature. The Attorney General opposed this request, and also moved the dismissal of the complaint. The District Court denied appellants' motions, and granted that of the Attorney General on the separate and distinct grounds that the complaint (1) raised no substantial constitutional question as to the validity of the statute and (2) presented no case or controversy appropriate for adjudication at this time. Since we find that the second of these grounds adequately supports the action of the District Court, we affirm on that ground and do not consider the constitutional challenge to the statute.

I

On February 15, 1950, the Attorney General's Conference on Organized Crime was held in Washington. As one consequence of its deliberations and recommendations, there was introduced in the Congress a bill, urgently supported by the Attorney General, which was enacted on January 2, 1951, as the Slot Machine Act of 1951. Its stated purpose was "to support the policy of those States which outlaw slot machines and similar gambling devices, by prohibiting use of the channels of interstate or foreign commerce for the shipment of such machines or devices into such States." Congress was explicitly of the opinion that machines of this character are a fertile source of revenue for nation-wide criminal syndicates which do not confine their illegal operations to gambling. H.R.Rep. No. 2769, 81st Cong., 2d Sess. (1950); U.S.Code Cong.Service 1950, p. 4240.

The Slot Machine Act of 1951 attacked the problem in several ways. It first made unlawful the knowing transportation in interstate commerce of any gambling device, as defined in the Act, into

any state where its use would not be legal under state law.[1] It further provided for registration with the Attorney General of "every manufacturer of and dealer in" gambling devices, and for marking such devices.[2] A separate section imposed certain requirements with respect to the labeling and marking of shipping packages. Violations of the Act were made punishable by fine or imprisonment, or both; and the machines themselves were made subject to confiscation and forfeiture.

Of critical importance to the efficacy of the Act was its definition of "gambling device." As originally passed in 1951, this definition was cast as

"(1) any so-called 'slot machine' or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as a result of the application of an element of chance, any money or property; or

"(2) any machine or mechanical device designed and manufactured to operate by means of insertion of a coin, token, or similar object and designed and manufactured so that when operated it may deliver, as the result of the application of an element of chance, any money or property." [3] (Emphasis supplied.)

It will readily be seen that the italicized words in the foregoing definition directed the major thrust of the 1951 Act to the then familiar and widely prevalent slot machine, or "one-armed bandit," as it is ruefully referred to by those addicted to the unequal sport it offers. The use of this language is quite understandable since, at the time, the traditional "slot machine" constituted the primary problem to be dealt with. Congress, however, failed to reckon with human ingenuity. New devices were developed which, although perhaps outside the definition in the Act, perpetuated the evils giving rise to the initial legislative concern. This story is briefly told in the following excerpt from the House Committee Report (H.R.Rep.No. 1828, 87th Cong., 2d Sess. 6 (1962); U.S.Code Congressional and Administrative News 1962, p. 3809) accompanying the bill eventually passed as the Gambling Devices Act of 1962:

"Eleven years of experience in the enforcement of this law [the Slot Machine Act of 1951, also known as the Johnson Act] show that there are serious inadequacies in it which must be corrected. New gambling machines have been developed which are controlled by syndicated crime, but which are not subject to the provisions of the Johnson Act because they are not coin-operated, do not pay off directly or indirectly, and do not have a drum or reel as in the conventional slot machine. Principally they are pinball machines which afford players an opportunity if certain combinations are achieved to register a great number of free games, in some instances up to 999 free games. These machines usually have a mechanism whereby the player can change the

1. Transportation into the District of Columbia or any possession of the United States was unqualifiedly covered, but Section 2 contemplated that states and their subdivisions might exempt themselves therefrom by statute. The 1962 amendment provided, additionally, that the Section should not apply to (1) gambling devices to be used in licensed gambling establishments where betting is legal under state law or (2) gambling devices enumerated as lawful in a state statute.

2. The 1962 amendment, in addition, requires that records be kept in respect to any business done concerning such devices; and makes the records subject to examination by agents of the Federal Bureau of Investigation.

3. The statutory definition extended also to any subassembly or essential part intended for use in connection with a gambling device.

odds merely by inserting more money into the machine or increase the number of balls that can be played by inserting more money. These free games can be played off or they can be eliminated from the machine by pressing a button or lever. The number of accumulated free games eliminated from the machine are recorded by a meter and payment to the player for the number of free games canceled is made by the proprietor of the establishment where the gambling machine is located or by his agent.

"The committee bill broadens the definition of the term 'gambling device' in the Johnson Act so as to include such pinball machines and any other mechanical devices which are designed and manufactured primarily for use in connection with gambling and which when operated may deliver as a result of the application of an element of chance any money or property, either directly or indirectly.

"Pinball and other machines, intended for amusement only, which award a limited number of free plays that are not convertible to money or other things of value, are not covered by this legislation."

The Gambling Devices Act of 1962 is not an independent piece of legislation; it is an amendment and revision of the 1951 Act. Several sections of the latter statute are left without change, and others are preserved in basic framework and content but with additions or alterations suggested by the significant span of experience under the 1951 law. The most important change is denoted by the expansion of the title from "Slot Machine" to "Gambling Devices" Act. The definition of "gambling device" contained in the 1951 Act is not itself basically changed, but it is expanded and clarified. The old-fashioned slot machine remains squarely in the sights of the law, but the target is enlarged to include other mechanical devices which were thought to offer similar opportunities of exploitation. Sub-section (1) of the definition is unchanged; but Sub-section (2) now reads as follows:

"(2) *any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling,* and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property." (Emphasis supplied.)

Presumably because of this broader sweep given to the concept of gambling device, the 1962 Act added a new section (Section 9) to the statute in order to make clear that certain types of machines were not to be regarded as within its terms. This section, set forth in the margin,[4] reflects a purpose by the Congress to address itself only to those machines which, although differing from the slot machine in physical design, are calculated to function quite as effectively

4. "None of the provisions of this chapter shall be construed to apply—

"(1) to any machine or mechanical device designed and manufactured primarily for use at a racetrack in connection with pari-mutuel betting,

"(2) to any machine or mechanical device, such as a coin-operated bowling alley, shuffleboard, marble machine (a so-called pinball machine), or mechanical gun, which is not designed and manufactured primarily for use in connection with gambling, and (A) which when operated does not deliver, as a result of the application of an element of chance, any money or property, or (B) by the operation of which a person may not become entitled to receive, as the result of the application of an element of chance, any money or property, or

"(3) to any so-called claw, crane, or digger machine and similar devices which are not operated by coin, are actuated by a crank, and are designed and manufactured primarily for use at carnivals or county or State fairs."

in separating the public from its money on a large scale. Between the relative specificity of this new listing of exclusions, on the one hand, and the general language used in the new category added to the definition of "gambling device," there is admittedly a wide range of potential applicability. But this appears to have proceeded from a conscious purpose on the part of Congress to anticipate the ingeniousness of gambling machine designers.[5]

## II

The amended statute became effective by its terms on December 17, 1962. Four days earlier the complaint in this case was filed. Plaintiff Lion Manufacturing Corporation is alleged to be an Illinois corporation engaged in the business of manufacturing and selling coin-operated amusement machines and other devices, with its principal place of business in Chicago. Plaintiff State Sales and Service Corporation is a Maryland corporation with its principal place of business in Baltimore. It is said to be engaged in the business of distributing machines manufactured by Lion and others, as well as the business of repairing, reconditioning, dealing in, and making available for use by others, such machines. Plaintiff O'Donnell serves as president of Lion. Plaintiff Weisman is president of State.

The complaint alleges certain facts with respect to the scope of plaintiffs' business activities, i. e., the dollar volume of sales, the investment in production facilities, and the number of employes involved. These are substantial. The complaint further asserts that, because of the possible applicability of the amended Act to plaintiffs' operations, it will be necessary for them, "for fear of criminal prosecution," to suspend operations after its effective date, with resulting immediate and irreparable harm. In the case of the individual plaintiffs, it is said that they "will be in peril of criminal prosecution and conviction unless they make admissions against interest, which may, in turn, expose them to criminal prosecution and conviction." [6]

The portions of the statute which are identified in the complaint as the source of these apprehensions are Section 2 (transportation in interstate commerce); Section 3 (the registration and record-keeping requirements); Section 4 (labeling and marking); Section 7 (the forfeiture provision); and, of course, Section 6 (the punishment provisions). These dangers all rest, so it is said, upon the new definition of gambling device added by Section 1(a) (2), quoted above, and it is against this provision that the attack is principally directed. The complaint alleges that, because of the vague-

---

5. This consideration appears clearly in the following statement made by the Attorney General in the course of his testimony in support of the amendments (Hearings on H.R. 3024, H.R. 8410 and S. 1658 Before the House Committee on Interstate and Foreign Commerce, 87th Cong., 2d Sess. 22 (1962):

"If you specify according to how they are operating now, they will, in my judgment, within a year think of new ways to operate which would not be covered by the * * * [statute]. I think the provision against machines made primarily for use in connection with gambling, with the burden of proof on the Government, will allow us to cover not only pinball machines, primarily used for gambling, but also to cover different kinds of machines that might be devised later.

"It will be incumbent upon the Government to prove that a particular ma-

chine was manufactured primarily for the purpose of gambling. I think that is a heavy burden of proof and is a protection for the individual. But I think it is broad enough and has to be broad enough because the facts warrant it."

6. The constitutional attack on the registration provisions is made principally on behalf of the individual plaintiffs who, so it is said, would be compelled to incriminate themselves contrary to the protection of the Fifth Amendment. But there is no allegation or showing that the privilege has been claimed, much less refused. See Communist Party v. S.A.C.B., 367 U.S. 1, 105–10, 81 S.Ct. 1357, 6 L. Ed.2d 625 (1961). Compare United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

ness of this definition, it cannot reasonably be determined whether the machines made and handled by plaintiffs are within or without the scope of the Act. It is also stated that, since the scheme of the Act in large part results in making questions of legality of conduct turn upon state law, plaintiffs will not, after the effective date of the amendments, be able to determine with precision or safety the existence or extent of a market for their products. In this regard, it is alleged that the laws of various states are unclear; and, in particular, a named statute of the State of Maryland is referred to as uncertain in respect of its relationship to the federal law.

Neither in the complaint nor anywhere else do the plaintiffs undertake to describe in detail the nature of the machines about which they profess concern. The general phrase used in the complaint is "coin-operated amusement machines." It is said that each involves "some element of skill as well as some element of chance"; pays "nothing in money or property"; and "rewards the player with nothing further than additional free plays of the machine." "Many" of the machines "may, if the ultimate user or player so desires, be used for gambling." There are no facts set forth with respect to the design or physical characteristics of the machines by which their capacities for utilization in serious gambling operations can be appraised; and, in particular, there is nothing from which an impression can be formed as to whether they are the type of machine described in the legislative history of the 1962 amendments.

The complaint recites that defendant Robert F. Kennedy is by law charged with the prosecution and enforcement of the federal criminal laws generally and of this Act in particular. It is nowhere alleged that the Attorney General, or anyone acting for him, has taken steps to initiate criminal prosecutions against plaintiffs or to require registration, nor that threats to this effect have been directed to plaintiffs. It is said that "these amendments and the statements of the Attorney General threaten" plaintiffs and their business operations; and this allegation is repeated later in the complaint in somewhat fuller terms: "This vague and uncertain legislation, the public pronouncements by the defendant Attorney General and members of his staff threatening vigorous prosecution of the legislation has and will cause the plaintiffs to suffer immediate irreparable harm."[7] These "public pronouncements" are not further identified or described, nor is there anything to indicate that, whatever they were, they had any more specialized reference to plaintiffs than to the world at large. The complaint does allege an effort by the appellant Lion to obtain from the Department of Justice an expression of opinion as to the application of the amended Act to their operations, but that this was refused.

### III

It seems to us from the foregoing that the advisory opinion withheld by the executive branch of the government was thereafter pursued in the judicial. But federal courts, at any rate, whose powers fall wholly within the ambit of Article III of the Constitution, lack jurisdiction to respond to such an application. Whether the relief sought is legal or equitable, injunctive or declaratory, it must be within the framework of a true case or controversy capable of meaningful adjudication. The District Court correctly concluded that that was not the situation here.

7. Appellants alleged in their complaint that they would suffer considerable injury even without a specific threat of enforcement. This is supported to some extent by information contained in an affidavit filed by Lion approximately three weeks after the statute became effective. This affidavit was submitted in support of an application for a temporary injunction, and stated that it had been necessary for Lion to lay off approximately one-half of its labor force, that sales had dropped by 75%, and that a large percentage of its manufacturing equipment was idle,— all as a result of the potential enforcement of the Act against Lion.

The conduct which would be reached by the statute, here sought to be invalidated at the very threshold of its expanded operation, was criminal in character, and the purpose of plaintiffs in coming to court was overridingly that of foreclosing criminal prosecutions against themselves. Courts have, however, long been wary of compromising the public interest in efficient law enforcement by intervening in advance to foreshorten the prosecutor's freedom of action.[8] In all courts a formidable buttress of this salutary principle has been the requirement that intervention must, at the very least, rest upon a showing of an immediate and tangible danger to the person assertedly apprehensive of prosecution. In the federal courts the shadow of the Constitution itself, in the contours of the case or controversy requirement, falls across his path.[9]

■ In this case there is, at the most, an allegation that the Attorney General expects to enforce the law as against all who may come within its range of operation. There has been no threat to plaintiffs in particular, as distinct from the citizenry at large. No proceedings of any kind have been initiated against plaintiffs, nor have they been notified of the inevitability of such action. It is established doctrine that the mere generalized declarations of purpose by a law enforcement officer that he will do his duty do not serve to provide a judicial forum to one who purports to fear the possible impact of that duty upon himself.[10]

There are other factors here which underscore the insubstantial nature of the controversy alleged to exist, and which, in turn, argue strongly that there was nothing before the District Court which could properly invoke the processes it provides for adversary litigation. Just as the complaint alleges no specific threat of prosecution, so it does not allege facts which raise such threat. The record does not show precisely what kind of machine or machines plaintiffs make or sell. For 'aught that appears, they may as well be within the exempting provisions of the statute as within its prohibitions. The Supreme Court has but lately indicated that constitutional attacks upon criminal statutes for vagueness are most usefully weighed in the context of a claim that certain specific conduct is proscribed. United States v. National Dairy Corp., 372 U.S. 29, 83 S. Ct. 594, 9 L.Ed.2d 561 (1963).[11] To as-

---

8. See Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

9. See United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); International Longshoremen's, etc. Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954).

10. This is not to say that there must always be an explicit and specific threat of enforcement in order that one may obtain a judicial declaration such as that sought here. No hard and fast rules are possible or desirable. Many factors enter into a decision that there is or is not a "case or controversy," including those hereinafter noted. Threat of enforcement is one of these factors, and the absence of a specific threat should be weighed against the probability of individualized injury to the plaintiff and facts alleged in the complaint from which one may draw a reasonable inference of imminent enforcement against the plaintiff. Whether this case would meet this test absent the factors about to be discussed is a question we need not now decide.

11. The Supreme Court's admonitions in this field have been clear and continuous:
    "Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case." Watson v. Buck, supra, 313 U.S. at p. 402, 61 S.Ct. at p. 967, 85 L.Ed. 1416.
    "The District Court did not err in dismissing the cross bill. Defendants are not entitled to invoke the Federal Declaratory Judgement Act in order to obtain an advisory decree upon a hypothetical state of facts. * * * By the cross bill, defendants seek a judgment that each and every provision of the act is unconstitutional. It presents a variety of hypothetical controversies which may never become real. We are invited to enter into a speculative in-

# 840

sert that an act of Congress is unconstitutional on its face is a formidable contention under any circumstances; the least that can be required of one who makes it is that he relate himself clearly to the impingement of the statute.[12] This, in order to create a meaningful lawsuit within our adversary tradition, calls for more than a mere prayer for an adjudication of the statute's invalidity now in order that one may be spared any prospect, however remote, of being obliged to defend oneself later.

Another consideration is that legality of conduct is, in respect of certain important aspects of the Act, dependent upon state law. There are 50 states in all, and the complaint does not identify which of those states are encompassed within plaintiffs' operations. Although, as the complaint alleges, state laws in this area are sometimes unclear, they can be and are often quite clear and might well operate to relieve plaintiffs from answerability under the federal law. The point, in any event, is that it is impossible to calculate from the facts before the District Court the degree to which plaintiffs are imperilled by the amended Act. The District Court does not sit to volunteer, at the behest of the curious, interpretations of state laws. It ventures into that area with reluctance under the most compelling circumstances.

We do not, thus, regard this complaint as creating a proper occasion for the invocation of judicial power. Its deficiencies in this regard result in a lack of jurisdiction in the District Court in an absolute sense and not merely in a discretion to withhold its exercise. There are no facts alleged which place plaintiffs in a truly adversary position *vis-a-vis* the defendant and under circumstances in which the judicial power can perform its traditional function of resolving an existing controversy between persons who have arrayed themselves in opposition to each other. The nature of plaintiffs' business being what it is, it would, no doubt, be useful and of interest to them to have an authoritative advance legal opinion as to how the statute operates, or, indeed, whether it operates at all. But it is not the business of courts to furnish such opinions outside the framework of the clashing interests and the concrete facts of a true lawsuit. There was none such here.

## IV

▉▉▉▉ There remains only the question of whether it was proper for a single judge to dismiss the complaint without convening a three-judge court. This inquiry needs to be made because 28 U.S.C. § 2284 does in terms place certain limitations upon a single judge, including the dismissal of complaints. However, as this court has recognized, Section 2284 is addressed to the manner in which a three-judge court must function once it has been convened.[13] It assumes jurisdiction in the District Court over the controversy, and its provisions come into play only when that jurisdiction exists. It remains for the judge who is asked to convene a three-judge court to determine whether jurisdiction exists in the District Court; and, if he properly concludes

quiry for the purpose of condemning statutory provisions the effect of which in concrete situations, not yet developed, cannot now be definitely perceived. We must decline that invitation." Electric Bond & Share Co. v. S. E. C., 303 U.S. 419, at p. 443, 58 S.Ct. 678, at p. 687, 82 L.Ed. 936 (1938).

12. In International Longshoremen's, etc. Union v. Boyd, supra, at p. 224, of 347 U.S., at p. 448 of 74 S.Ct., 98 L.Ed. 650, the Supreme Court states:

"Determination of the scope and con-stitutionality of legislation in advance of its immediate adverse effect *in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.* * . * * Since we do not have on the record before us a controversy appropriate for adjudication, the judgment of the District Court must be vacated, with directions to dismiss the complaint." (Emphasis added.)

13. Eastern States Petroleum Corp. v. Rogers, 108 U.S.App.D.C. 63, 68, 280 F.2d 611, 616, cert. denied, 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960).

there is no jurisdiction, his power to dismiss the complaint, as well as to deny the motion to convene a three-judge tribunal, is in no way circumscribed by Section 2284.[14]

Affirmed.

14. Eastern States Petroleum Corp. v. Rogers, supra. The availability in the Courts of Appeals of direct review of determinations of this kind by a single judge has, after some period of uncertainty, now been solidly established. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962) ; cf. Svejkovsky v. Tamm, 117 U.S. App.D.C. ——, 326 F.2d 657 (1963). It is suggested with some plausibility that this circumstance looks in the direction of an enlarged area of determination by a single judge. See Note, The Three-Judge District Court: Scope and Procedure Under Section 2281, 77 Harv.L.Rev. 299 (1963).