**DIAMOND GAME ENTERPRISES, INC., Kickapoo Traditional Tribe of Texas, Plaintiffs,**

**The Cheyenne and Arapaho Tribes of Oklahoma Gaming Commission, on behalf of The Cheyenne and Arapaho Tribes of Oklahoma, Plaintiff–Intervenor,**

v.

**Janet RENO, Attorney General of the United States, et al., Defendants,**

**The State of Alabama, The State of California, and The State of Florida, Defendant–Intervenors.**

Civil Action No. 97–CV–452(RMU).

United States District Court, District of Columbia.

June 23, 1998.

William H. Pryor, Jr., Alabama Office of the Attorney General, Montgomery, AL, Munford Page Hall, II, Dorsey & Whitney, L.L.P., Washington, DC, James E. Townsend, Thomas J. Peckham, Dorsey & Whitney, L.L.P., Minneapolis, MN, Lee Bergen, Nordhaus, Haltom, Taylor, Albuquerque, NM, Stephen A. Lenske, Lenske & Abramsom, Woodland Hills, CA, for Plaintiffs.

William H. Pryor, Jr., Alabama Office of the Attorney General, Montgomery, AL, Munford Page Hall, II, Dorsey & Whitney, L.L.P., Washington, DC, for Plaintiff-Intervenors.

William H. Pryor, Jr., Alabama Office of the Attorney General, Montgomery, AL, Edward J. Passarelli, Michael Kerry Martin, Lewis Steven Weiner, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Defendants.

William H. Pryor, Jr., Carol Jean Smith, Alabama Office of the Attorney General, Montgomery, AL, Jonathan A. Glogau, Office of the Attorney General, Tallahassee, FL, Manuel Michael Medeiros, Office of the Attorney General, Sacramento, CA, Robert A. Butterwick, Office of the Attorney General, Tallahassee, FL, for Defendant-Intervenors.

## MEMORANDUM OPINION

URBINA, District Judge.

### I. Introduction

The plaintiffs [1] bring suit seeking declaratory judgment and injunctive relief to prevent the defendants [2] from commencing forfeiture proceedings on gaming devices used in Indian gaming casinos. Specifically, the plaintiffs seek an order declaring that the Lucky Tab II machine is a Class II electronic aid which, under the Indian Gaming Regulation Act, ("IGRA"), 25 U.S.C. § 2703(7)(A), assists its users in playing the traditional pull-tab game. In addition, the plaintiffs also seek to enjoin the defendants from interfering with the plaintiffs' right to manufacture, install and operate the Lucky Tab II gaming devices.

The issues come before the court on the parties' cross-motions for summary judgment. This case is appropriate for resolution by summary judgment since it presents no genuine issues of material fact. Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The motions frame the dispositive issue as follows: Is the Lucky Tab II machine an "aid" to the traditional pull-tab game—thus making it a Class II gambling device which can be operated without state or federal involvement; or is the Lucky Tab

1. The plaintiffs are the Kickapoo Traditional Tribe of Texas, a federally recognized Indian tribe, and Diamond Game Enterprises, Inc., the manufacturer and distributor of the Lucky Tab II gaming device. The plaintiff-intervenor is the Cheyenne and Arapaho Tribes of Oklahoma Gaming Commission which joins this litigation on behalf of two federally recognized Indian tribes, the Cheyenne and Arapaho Tribes of Oklahoma. Since the rights and interests of these two groups of plaintiffs are identical, the court shall reference them collectively as the plaintiffs, unless other specified.

2. The federal defendants are the Attorney General of the United States Department of Justice and the National Indian Gaming Commission and the U.S. Attorney for Western Texas. The state defendant-intervenors are Alabama, California and Florida. Since the claims and defenses of the federal defendants and the state defendant-intervenors are similar the court shall refer to these defendants collectively as "the defendants," unless otherwise specified.

II a "facsimile" of the pull-tab game—thereby rendering it a Class III gaming apparatus which necessitates a tribal-state compact for its legal operation? Upon consideration of the parties' submissions, oral and evidentiary presentation, and the law relevant to this controversy, the court concludes that the Lucky Tab II is a Class III gaming device. Accordingly, the court grants the federal defendants' and defendant-intervenors' motions for summary judgment in part and denies them in part. The plaintiffs' motion is denied.

## II. Background

Plaintiff Diamond Game Enterprise, Inc., manufactures and distributes Lucky Tab II gaming devices to Indian tribes. In August 1996, plaintiff Kickapoo Tribe of Texas began operating approximately 100 Lucky Tab II devices on its Reservation. This drew the attention of the Director of Enforcement of the National Gaming Commission who informed the Kickapoo Tribe that these devices were subject to enforcement proceedings. The Director, however, advised the Tribe that he would defer any enforcement action while the parties negotiated the classification of the Lucky Tab II. At the time, the Director advised the plaintiffs that the Lucky Tab II gaming device could only be manufactured or operated pursuant to a tribal-state compact. On March 18, 1997, plaintiffs Kickapoo Tribe and Diamond Enterprises filed an action in this court seeking declaratory judgment establishing the Lucky Tab II gaming device as a permissible aid to a Class II pull-tab game. The plaintiffs also sought injunctive relief to preclude the federal defendants from taking civil, criminal or administrative action against the manufacturers and operators of the Lucky Tab II device.

On April 10, 1997, aware of the pending action and the uncertain classification of the Lucky Tab II, the Cheyene and Arapho Tribes of Oklahoma began operating 100 of these gaming devices on their respective Reservations. Consequently, these two tribes filed a motion to intervene in the then-pending motion for preliminary injunction. The court granted their motion to intervene as plaintiffs. On May 12, 1997, the court

denied the plaintiff's motion for preliminary injunction and consolidated it with the action on the merits pursuant to Fed.R.Civ.P. 65(a)(2). On the same day, the parties entered into a stipulation which specified that the federal defendants agreed to refrain from taking any action against the plaintiffs in connection with the Lucky Tab II device predicated upon the plaintiffs ceasing to operate the Lucky Tab II devices until the court's final resolution of this issue.[3]

Before discussing the merits of the controversy resolved by the court's determination that the Lucky Tab II fails to qualify as a Class II gaming device, the court will briefly address (1) the federal defendants' challenge to the court's jurisdiction, and (2) the plaintiffs' assertion that the IGRA implicitly repealed the Johnson Act's overly broad definition of "gambling device."

## III. Discussion

### A. The Plaintiffs Have Properly Alleged Federal Jurisdiction

The federal defendants challenge the court's jurisdiction to preside over this dispute on grounds of sovereign immunity and interference with prosecutorial discretion. Neither ground is availing. Simply stated, the court has jurisdiction because 28 U.S.C. § 1331 vests district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Similar to the present action, in a case involving the classification of a gaming device under the IGRA, the Ninth Circuit succinctly stated on the jurisdictional point, "[s]ection 1331 is enough; be it IGRA or the federal common law of Indian affairs that allocates jurisdiction among the federal government, the tribes, and the states." *Sycuan Band of Mission Indians v. Roache,* 54 F.3d 535, 538 (9th Cir.1994). Likewise, in *Cabazon Band of Mission Indians v. National Indian Gaming Comm'n,* 827 F.Supp. 26 (D.D.C.1993) this court ruled that it had proper jurisdiction to adjudicate the Cabazon Band's motion for declaratory judgment under the IGRA because the Cabazon Band invoked jurisdiction under 28 U.S.C. § 1331.

**3.** *Diamond Game Enterprises v. Janet Reno,* Civil Action No. 97–452 (D.D.C. May 12, 1997).

827 F.Supp. 26, 29 n. 5 (D.D.C.1993) *aff'd* 14 F.3d 633 (D.C.Cir.1994) (*"Cabazon II"*). The controversy in the instant case invites this court's interpretation and application of the IGRA, a federal statute within the meaning of 28 U.S.C. § 1331. Consequently, the court resolves the jurisdictional issue in favor of the plaintiffs.

### B. IGRA Does Not Implicitly Repeal the Johnson Act Because Both Statutes Can Coexist Without Conflict

■ In 1962, Congress enacted the Gambling Devices Act which amended the Slot Machine Act of 1951 (better known as the Johnson Act). 15 U.S.C. §§ 1171 *et seq.* The 1962 Gambling Devices Act was not an independent piece of legislation; rather Congress promulgated it as an amendment revising the Johnson Act. *Lion Mfg. Corp. v. Kennedy,* 330 F.2d 833, 836 (D.C.Cir.1964). The most important revision was the expansion of the Johnson Act's definition of the term "gambling device." This new definition broadened the previous definition of "gambling device" by including within its scope "other mechanical devices which were thought to offer similar opportunities in exploitation" as did the slot machine. *Id.* As it stands, the Johnson Act not only defines the "gambling device," 15 U.S.C. § 1171(a), but also prohibits the possession and operation of any such device, 15 U.S.C. § 1175, unless authorized under a tribal-state compact. 25 U.S.C. § 2710(d)(6). The Johnson Act, in pertinent part, defines "gambling device" as

(2) any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as a result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property, or ... any subassembly or essential part intended to be used in connection with any such machine or mechanical device, but which is not attached to any such machine or mechanical device as a constituent part, or

(3) any subassembly or essential part intended to be used in connection with any such machine or mechanical device, but which is not attached to any such machine or mechanical device as a constituent part.

15 U.S.C. § 1171(a)(2) and (3).

In 1988, Congress enacted the Indian Gaming Regulation Act ("IGRA"), codified at 25 U.S.C. §§ 2701 *et seq.,* following the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (*"Cabazon I"*) which authorized gaming on federally recognized Indian lands. Congress intended for the IGRA to govern gaming activities on Indian Reservations. As a result, the IGRA grouped the various types of gaming into three categories: Class I, Class II and Class III. Each of these classes is subject to a differing state and federal regulatory scheme and involvement. *See Cabazon Band of Mission Indians v. National Indian Gaming Comm'n,* 827 F.Supp. 26, 27 (D.D.C.1993) (*"Cabazon II"*). Class I gaming encompasses social games for prizes of minimal value and traditional forms of Indian gaming. 25 U.S.C. § 2703(6). These games are within the tribes' exclusive jurisdiction. 25 U.S.C. § 2710(a)(1). Class I gaming is not at issue here.

The IGRA defines Class II gaming as "the game of chance commonly known as bingo (whether or not electronic, computer, or other *technologic aids* are used in connection therewith) ... including (if played in the same location) *pull-tabs,* lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, ...." 25 U.S.C. § 2703(7)(A) (emphasis added). Class II gaming, however, does not include "electronic or *electromechanical facsimiles* of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B). Class III gaming, on the other hand, acts as a residual category and includes "all forms of gaming that are not [Cl]ass I or [Cl]ass II gaming." 25 U.S.C. § 2703(8). Under the IGRA, Class II gaming devices can be lawfully operated on Indian lands without the need for a tribal-state compact. The lawful operation of Class III gaming devices, however, requires such a

compact. Without such a compact, the use of these devices is prohibited. 25 U.S.C. § 2710(b)(1)(A).[4]

In addition, the IGRA created the National Indian Gaming Commission ("Commission") to promulgate regulations implementing its provisions. In that vein, the Commission's regulations described the type of technology permitted or prohibited for use in conjunction with a Class II gaming device on Indian lands. Under the Commission's regulations, a "technological aid" to a Class II gaming device is permitted, but an "electromechanical facsimile" of such a game is unlawful. The regulations defined a permissible "technologic aid" to a Class II gaming as "a device such as computer, telephone, cable, television, satellite or bingo blower." 25 C.F.R. § 502.7. The regulations, on the other hand, delineated a prohibited "electromechanical facsimile" to a Class II gaming device as "any gambling device as defined in [the Johnson Act] 15 U.S.C. § 1171(a)(2) or (3)." 25 C.F.R. § 502.8. The Commission therefore incorporated the Johnson Act's definition of "gambling device" into its regulatory scheme making an "electromechanical facsimile" of a Class II gaming device unlawful.

The plaintiffs challenge the validity of 25 C.F.R. § 502.8 and the Johnson Act's definition of "gaming device" asserting that such a definition conflicts with the IGRA. Specifically, the plaintiffs claim that the Johnson Act's overly broad definition of "gaming device" embraces within its ambit Class II aids which the IGRA actually authorizes. The plaintiffs, therefore, contend that Congress intended for subsequently enacted portions of the IGRA to repeal the Johnson Act's overly broad definition of "gaming device." The court rejects this argument and concludes that the Johnson Act and the IGRA interface without conflict.

 It is well settled principle of statutory interpretation that " 'repeals by implica-

tion are not favored.' " *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976). Repeals by implication, however, may occur " '(1) where provisions in the two acts are in irreconcilable conflict ... and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.' " *Id.* (quoting *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936)). In either circumstance, the legislative intent to repeal must be clearly manifested. *Id.* Thus, "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). "[I]t is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem." *Radzanower*, 426 U.S. at 155, 96 S.Ct. 1989. Therefore, "when two statutes are capable of co-existence, it is the duty of the courts, absent clearly expressed congressional intention to the contrary, to regard each as effective." *Morton*, 417 U.S. at 550, 94 S.Ct. 2474. These statutory construction principles "fit without special tailoring in the Indian law context." *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 790 (1st Cir.1996). Here, neither condition for implicit repeal exists. The Johnson Act and the IGRA are not in irreconcilable conflict, and Congress did not intend for the IGRA to implicitly repeal the Johnson Act.[5]

Contrary to the plaintiffs' challenge to the Johnson Act's overly-broad definition of "gambling device," Congress indeed intended to implement an expansive definition of gambling device to combat the ingenuity of gambling machine designers and manufacturers. In 1962, when Congress amended the Johnson Act it intended to broaden "the definition

---

4. For the purposes of this opinion, the term "prohibited" is used to mean prohibited or unlawful without the benefit of a tribal-state compact as required by law.

5. To be sure, there is only one explicit repeal of the Johnson Act by the IGRA. In 25 U.S.C. § 2710(d)(6), Congress repealed the applicability

of the Johnson Act to the operation of Class III gaming devices to permit their use pursuant to a tribal-state compact. There is no other indication that Congress intended to repeal other portions of the Johnson Act, either explicitly or implicitly. *See Cabazon II*, 827 F.Supp. at 31.

of the term 'gambling device' in the Johnson Act so as to include such pinball machines and *any other mechanical devices which are designed and manufactured primarily for use in connection with gambling and which when operated may deliver as a result of the application of an element of chance any money or property either directly or indirectly.*" H.R.Rep. No. 1812, 87th Cong., 2nd Sess. (1962), reprinted in 1962 U.S.C.C.A. 3809 (emphasis added). The 1962 Act did not alter the definition of "gambling device" in the Johnson Act; rather, it expanded on that definition. *Lion Mfg. Corp. v. Kennedy,* 330 F.2d 833, 836–37 (D.C.Cir.1964). "The old-fashioned slot machine remains squarely in the sights of the law, but the target is enlarged to include other mechanical devices which were thought to offer similar opportunity of exploitation." *Id.* at 836. This expanded definition of "gambling device" reflected a calculated purpose by Congress to proscribe "those machines, which although differing from the slot machine in physical design, are calculated to function quite as effectively in separating the public from its money on a large scale." *Lion Mfg. Corp.,* 330 F.2d at 836–37. The D.C. Circuit in *Lion Mfg. Corp.* reviewed the expanded meaning of "gambling device" and opined that it has "admittedly a wide range of potential applicability." *Id.* at 837. The D.C. Circuit, however, concluded that this expanded definition "appears to have proceeded from a conscious purpose on the part of Congress to anticipate the ingeniousness of gambling machine designers." *Id.* Thus, whatever concern that the plaintiffs may have with the breadth of coverage of the Johnson Act, Congress precisely intended the Johnson Act to have an expansive definition of "gambling device." In this regard, "it is clear that Congress' intent in IGRA is fulfilled only when IGRA's definition of facsimile adopts the Johnson Act's definition of

gambling devices." *Cabazon II,* 827 F.Supp. at 32. Clearly, the interrelationship between the IGRA and the Johnson Act, through 25 C.F.R. § 502.8, does not create an irreconcilable conflict, rather these two statutes complement each other.

Moreover, the plaintiffs' challenge to the breadth of the Johnson Act was raised and rejected by this court in *Cabazon II,* 827 F.Supp. at 31. The plaintiffs in *Cabazon II* contended that the definition of "gambling device" proscribes any device that might be used in gambling. The *Cabazon II* court rejected this argument as an inaccurate interpretation of the Johnson Act and stated that "[w]hen the scope of the Johnson Act is properly determined, it is clear that the definition of gambling devices is significantly less broad than plaintiffs fear." *Id.* at 31. The *Cabazon II* court then went on to hold that the Commission's definition of facsimile incorporating the Johnson Act is "the only definition possible in order to implement Congress' explicit intent, as expressed in IGRA." *Id.* This court agrees and accordingly rules that, except for the limited repeal in 25 U.S.C. § 2710(d)(6), *see* note 5 *supra,* the IGRA does not repeal the Johnson Act because the statutes are consonant. Indeed, the court's review of the IGRA's legislative history provides no evidence that Congress intended for the IGRA to abrogate the Johnson Act.[6] The court, therefore, rejects the plaintiffs' contention that the IGRA implicitly repealed the Johnson Act.

## C. Under The Plain Language of the IGRA, The Lucky Tab II Is a Class III Gaming Device Which Cannot Be Operated Without A Tribal–State Compact

■ The gravamen of controversy here is centered on the nature of the Lucky Tab II as either an electronic or computer "aid" to

6. The plaintiffs claim that the Commission contemplated classifying the Lucky Tab II as a permissible Class II gaming device and amending its regulations to resolve any inherent ambiguity to reconcile those regulations with the Johnson Act. The plaintiffs allege that two U.S. Senators improperly exerted their political influence to prevent the Commission from carrying out their intentions. Allegations of improper political in-

fluence are impertinent to the court's responsibility in construing the scope and validity of statutes enacted by Congress. *See Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 831, 106 S.Ct. 3229, 3244, 92 L.Ed.2d 650 (1986) ("final responsibility interpreting the statute in order to carry out the legislative mandate belongs to the federal court").

the traditional game of pull tab, or an electronic "facsimile" of that game. The plaintiffs urge that the court can determine the status of the Lucky Tab II as a Class II or III gaming device by simply looking to the IGRA and its legislative history. *See* Cabazon *II,* 827 F.Supp. at 32.

As discussed above, the IGRA defines Class II gaming as "[a] game of chance commonly known as bingo (whether or not electronic, computer, or other *technologic aids* are used in connection therewith) ... including (if played in the same location) *pull-tabs,* lotto, punch boards, tip jars, instant bingo, and other games similar to bingo...." 25 U.S.C. § 2703(7)(A) (emphasis added). Class II gaming, however, does not include "electronic or *electromechanical facsimiles* of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B) (emphasis added). Under the IGRA, Indian tribes may operate Class II gaming on Indian lands where such gaming is allowed. The Class III gaming classification serves as a residual category and includes "all forms of gaining that are not class I or class II gaming." 25 U.S.C. § 2703(8). Class III gaming is permitted only if the tribes and the relevant states form a tribal-state compact to allow such gaming on Indian lands. 25 U.S.C. § 2710(b)(1)(A). Naturally the query resolves into: what is an "aid" and what is an "electromechanical facsimile"?

The plaintiffs claim that application of the dictionary meaning of the terms "aids" and "facsimiles" result in the classification of the Lucky Tab II as a Class II gaming device. The plaintiffs urge the court to adopt a broad definition of the term "aid" suggesting that any device that fits this definition is lawful. The court, however, disagrees on a more fundamental level because the Lucky Tab II is not an "aid" but is a device that replicates the traditional pull-tab game.. Indeed, the legislative history of the IGRA in fact counsels in favor of the conclusion that the Lucky Tab II is not a permissible Class II gaming device. The Senate Committee Report on the IGRA in relevant context states:

> Class II gaming is defined in section 4(7)(A)(B)(C) and (D). Consistent with tribal rights that were recognized and af-firmed in the *Cabazon* [480 U.S. 202, [107 S.Ct. 1083] (1987) ] decision, the Committee intends in section 4(7)(A)(i) that tribes have maximum flexibility to utilize games such as bingo and lotto for tribal economic development. The Committee specifically rejects any inference that tribes should restrict class II games to existing game sizes, levels of participation, or current technology. The Committee intends that tribes be given opportunity to take advantage of modern methods of conducting class II games and the language regarding technology is designed to provide maximum flexibility. In this regard, the Committee recognizes that tribes may wish to join with other tribes to coordinate their class II operations and thereby enhance the potential of increasing revenues. For example, linking participant players at various reservations whether in the same or different States, by means of telephone, cable, television or satellite may be a reasonable approach for tribes to take. Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games and as long as such games are otherwise operated in accordance with applicable Federal communications law. *In other words, such technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players.*

S.Rep. No. 446, 100th Cong., 2nd Sess. (1988), reprinted in 1988 U.S.C.A.A.N. 3071, 3079 (1988) ("Senate Committee Report") (emphasis added).

Courts that have reviewed the legislative history of the IGRA have recognized an electronic, computer or technological aid to possess at least two characteristics: (1) the "aid" must operate to broaden the participation levels of participants in a common game, *Spokane Tribe of Indians v. United States,* 782 F.Supp. 520, 523 (E.D.Wash.1991) *aff'd*

972 F.2d 1090, 1093 (9th Cir.1992); and (2) the "aid" is distinguishable from a "facsimile" in which a single participant plays with or against a machine rather than with or against other players. *Cabazon,* 14 F.3d at 636–37; 1988 U.S.C.A.A.N. at 3079. The Lucky Tab II possesses neither of these characteristics.

First, the Lucky Tab II does not operate to broaden the participation levels of the participant in the pull-tab game. The electronic or technological aids contemplated in the Senate Committee Report are those "applications which enhance communications with the announced goal of broadening participation levels." *Spokane,* 782 F.Supp. at 524. A communication technology that broadens participation levels allows "simultaneous games participation between and among Reservations" or even among participants in the same location. *See Sycuan,* 54 F.3d at 543 (quoting Committee Report, 1988 U.S.C.A.A.N. 3079); *see Cabazon,* 14 F.3d at 637 *aff'g* 827 F.Supp. 26 (D.D.C.1993). Here, at any given time a single participant plays a self-contained machine—not with other players. The participant plays the Lucky Tab II by inserting money into the machine. A single ticket is then dispensed from a large roll of pull-tabs inside the machine. As the ticket pull-tab is being dispensed, the scanner inside the Lucky Tab II reads a bar code on the back of the pull-tab ticket and provides a video display of the encoded symbols on the pull-tab. The Lucky Tab II also contains a variety of light and visual effects, not dissimilar to a slot machine. Distinctive audio sounds and visual signals inform the participant of a winning ticket which can be redeemed for a monetary prize. The Lucky Tab II has no other technological capability. Its current technological configuration does not permit multiple players to participate in the game at one time. When a participant plays a particular Lucky Tab II machine, others are precluded from using that machine until that person stops playing. The Lucky Tab II also lacks the technology that permits for the linking up with other participants from the same location or from other remote locations to play the basic game of pull-tab. Accordingly, the Lucky Tab II is not an electronic aid as contemplated under the IGRA.

Second, from the player's perspective the Lucky Tab II is not distinguishable from an electronic facsimile in which a single participant plays a game with or against the machine rather than with or against other players. Courts have adopted the plain meaning of the term "facsimile" and recognized that a facsimile of a game is one that replicates the characteristics of the underlying game. *See Sycuan,* 54 F.3d at 542 ("the dictionary meaning of 'facsimile' is an 'exact and detailed copy of something' ") (quoting Webster's Third New International Dictionary 813 (1976)); *Cabazon II,* 827 F.Supp. at 32 (adopting the dictionary meaning of facsimile); *Cabazon,* 14 F.3d at 636 ("[a]s commonly understood, facsimiles are exact copies, or duplicates").

Here, the Lucky Tab II presents for consumers use a "facsimile" of the traditional pull-tab game. In the traditional pull-tab game, a player purchases a pull-tab from a clerk or a vendor, and then manually removes the opaque cover to read the printed symbols to determine whether she possesses a winning pull-tab. If the pull-tab is a "winner," the player then collects a monetary prize commensurate with the revealed symbols. The plaintiffs urge that the Lucky Tab II is merely a dispenser of the pull-tabs and that the machine is useless without the roll of pull-tabs inside of it. The plaintiffs point out that the pull-tabs themselves can be sold and played apart from the Lucky Tab II. From these assertions, the plaintiffs conclude that the Lucky Tab II retains the fundamental characteristics of the traditional game and is therefore only an aid to the playing of that game. This analysis fails to examine the device in its full operational context.

When the participant plays the Lucky Tab II, she is not playing the pull-tabs inside the machine; she is engaging the machine that replicates the functions of the traditional pull-tab game. Indeed, the Lucky Tab II performs all the functions that a player of the traditional pull-tab game would have performed, including selecting a pull-tab ticket, disclosing the hidden symbols on the ticket and determining whether a particular pull-

tab ticket is a "winner." Thus the Lucky Tab II is facsimile of the traditional pull-tab game. Furthermore, when the participant plays the Lucky Tab II, that person plays with or against the machine and not with or against other players.

Centering on the notion that the Lucky Tab II is an aid enabling players to compete with one another, the plaintiffs emphasize that the machine facilitates players' ability to contend with other players in their quest to choose the winning pull-tab ticket. More precisely, the plaintiffs argue that the rolls of pull-tabs in the several Lucky Tab II machines come from the same deal. Each deal consists of several rolls of pull-tabs and each deal has a finite number of winning pull-tab tickets. The plaintiffs, therefore, conclude that the players compete with one another in choosing from the limited number of winning tickets. This creative argument fails to consider that the inner configuration of the Lucky Tab II is irrelevant to the participant. When playing the Lucky Tab II machine, the player only recognizes that she is playing with or against the machine and focuses little, if at all, on the point that she is competing with other players in selecting the winning ticket. In fact, from a player's perspective, the Lucky Tab II is practically indistinguishable from the video pull-tab machine in *Cabazon II*, 827 F.Supp. 26 (D.D.C. 1993), or the Auto-tab 101 gaming device in *Sycuan*, 54 F.3d 535 (9th Cir.1994). Both of these machines were classified as Class III gaming devices because they were electronic facsimiles to the underlying games and thus unable to be operated without a tribal-state compact.

In *Cabazon II*, the court declared that the video pull-tab game replicates the paper version of the game and thus is a facsimile of the paper version of that game. 827 F.Supp. at 32. The participant plays the video pull-tab by inserting money into the machine. The computer randomly selects a card for the player, reveals the pull-tab and displays it on a video monitor. This video pull-tab version, similar to the traditional pull-tab, has a fixed number of winning pull-tabs in a deal. *Cabazon*, 14 F.3d at 635 (describing the functional operation of the video pull-

tab). The district court, adopting the plain meaning of "facsimile," concluded that the video pull-tab is a replica of the paper version of the pull-tab game. *Cabazon II*, 827 F.Supp. at 32. The *Cabazon II* court, therefore, held that the video pull-tab is a Class III gaming device. Similarly, in *Sycuan*, the court determined that the Auto-tab Model 101 is an electronic facsimile of the pull-tab game. 54 F.3d at 535–36. The Auto–Tab Model 101, a self contained device which is played by inserting money into the machine. Once a player receives a video version of the pull-tab ticket, she can then electronically uncover the pull-tab to determine whether the ticket is a winner. If the ticket is a winner, the player can either add to the credit or print out the ticket and redeem it for money. The *Sycuan* court held that the Auto-tab Model 101 is a "facsimile" to the underlying game. Essentially both of these machines allow the participants to play with or against the machines and not with or against other players. From a participant's view point, there are no differences between the Lucky Tab II and these two Class III gaming machines. In sum, the Lucky Tab II is not a Class II electronic aid to the traditional pull-tab game, but rather it presents the player with an electromechanical facsimile of that game rendering it a prohibited Class III gaming device. 25 U.S.C. § 2703(8).

## V. Conclusion

Plaintiffs also urge the court to consider the policy implications behind gaming devices like the Lucky Tab II. The plaintiffs contend that these gaming devices are important to tribal economic survival. These policy considerations are legitimate claims, but they are outside the court's province and are more appropriately addressed by Congress. *See Spokane*, 782 F.Supp. at 524.

In conclusion, the court rules that the Lucky Tab II falls within a Class III gaming category. The Lucky Tab II, therefore, can only be operated subject to a tribal-state compact. Accordingly, the plaintiffs' motion for summary judgment is denied. The federal defendants' and state-intervenors' motions for summary judgment are granted in part and denied in part. The motions are granted

as to the classification of the Lucky Tab II. The motions, however, are denied as to the assertion that the court lacks jurisdiction.

**SO ORDERED.**

A separate Order for Entry of Judgment accompanies this Memorandum Opinion.

## ORDER AND FINAL JUDGMENT

This matter comes before the court on the parties' cross-motions summary judgment. Upon consideration of the parties' submissions, oral and evidentiary presentation, and the law relevant to this controversy, for the reasons stated in the accompanying Memorandum Opinion the court concludes that the Lucky Tab II is a Class III gaming device.

Accordingly, it is this 23 day of June, 1998,

**ORDERED** that plaintiffs' motion for summary judgment be and is hereby DE-NIED; it is

**FURTHER ORDERED** that the federal defendants' motion for summary judgment be and is hereby **GRANTED** as to the classification of the Lucky Tab II as a Class III gaming device, but otherwise **DENIED** as to the jurisdictional assertion; it is

**ORDERED** that the state defendant-intervenors' motion for summary judgment be and is hereby **GRANTED**; it is

**FURTHER ORDERED** that the federal defendant's motion to strike be and is hereby **DENIED**; it is

**ORDERED** that the parties' several motions to file *errata*, to file surreply, to file supplemental reports and memoranda, and to exceed page limitations be and are hereby **GRANTED** *nunc pro tunc*; and it is

**FURTHER ORDERED** that Judgment is hereby entered in favor of the federal defendants and the defendant-intervenors, and the above-captioned be and is hereby **DISMISSED** with prejudice.

**SO ORDERED.**